Good morning, Your Honors. May it please the Court, my name is Charles Rubin. I represent Matrix Motors Corporation, which is the appellant appealing a summary judgment granted against it on a trademark dispute regarding the trademark name Matrix. This summary judgment motion, which seems to be pretty popular here this morning, it's the third one, is reviewed to no vote by the Court. If the Court finds the genuine issue of a material fact, then the Court, giving the evidence most favorable to Matrix Motor Company, would find that this case has to be reversed and sent back to the trial court for trial. If the testimony is in conflict, which I believe I will establish that for Your Honors this morning, then the trial court's conclusion could be reasonably come up with a different conclusion by the Court. Therefore, it should go back to the trial court for a ruling on the facts. In summary judgment regarding trademark disputes, it is clear that trademark disputes are factually intensive, as well as likely to have confusion issues, and therefore they're disfavored in summary judgment. I felt the best way to approach this subject with the Court — It's not a law of law that summary judgment is always disfavored, but we need to look at what the triable issues are. Right. And that's where I want to focus on. What are the genuine issues of material fact that give rise to this Court, a request to this Court, to reverse? The first issue is whether Matrix Motors, which is the appellant, was the first entity to use the trademark in commerce by selling one of its cars with the name on it. There was substantial evidence in the record to support that. Matrix Motors began using the name Matrix in January of 1995, sold ten cars in the United States, six in the United States, three in California, two in Tennessee, and one in Georgia, all with the name Matrix either on the car, on the parts, or on the engine. Did any of those sold in the United States have Matrix on the car? Yes. You mean on the outside body? On the outside of the car. No. I believe one that went to Europe did have it on the outside of the body, but the one sold in the United States had it either on the engine, on the body, on the frame, on the chassis, but not on the outside of the car prominently displayed. It also sold several engines and transmissions with the name on it, and it registered the trademark name on December 5, 2000, with the Secretary of State of California. From 1995 to the present... The name being just Matrix? Yes. The name Matrix. Why would it be relevant, or I mean, do you think it's relevant or irrelevant if the mark is on the outside of the car as compared to being on something, some part on the inside of the car? I don't. I believe that in the case of, I think it's Sengofu, S-E-N-G-O-F-U, it says the first to use the mark in commerce owns the mark. It doesn't say the first to use the mark on the outside of the product is the first to use the mark. I haven't seen any cases that say it must be prominently shown on the outside. The question is what is the product, I suppose. The product is the car. The product is the race car. And the product is going to be the subsequent $75,000 roadster and the other passenger cars that are being developed. Those are the products. It makes parts for these cars, but... Well, no, but I mean, in where you used the mark previously, were you using it on a car? And I thought that there was at least a question to me as to whether or not you meant that that car was a matrix or whether the parts that were in the car had been marked in a matrix. No, the car is the matrix. I think I see the confusion. The product is the car, but the name matrix is not always on the outside of the car.  But you also make parts that are matrix parts, right? For the matrix car, not for other cars. They make transmissions for their cars, they make engines for their cars. They don't make it for everybody else. That was the first genuine issue of material fact that we believe there's a dispute, a genuine dispute. What was the evidence, the nature of the evidence on your side of the case on the half fixation or, you know, by the putting of the mark in commerce? Was it testimony of a witness? Yes. It's located on the deposition testimony of Mr. Bergeon in excerpts 284 to 287, where he describes the various cars, when they were sold, to whom they were sold to, which include all 10, but two or three were outside the United States. And so that's where there was detail. And there's been no evidence ever submitted to contradict it. But this is why I'm not sure it really is an issue of fact, because even if we accept all of that, I'm not sure that it's so well established that that constitutes use for purposes of the protection. Intellectual property is not my field. So you're going to have to maybe go slowly here. My understanding or treatment of this field is one that's aimed more at maybe from a consumer protection standpoint, that the consumer is not confused by the trademark that's attached. And leaving aside the issue of what market it goes for, does this constitute use for a market in a way that could possibly lead to any kind of consumer confusion? Does this identify matrix as a flag that is owned by your client, as opposed to a name that's put on some parts inside of a car sold as a race car to a handful of people over 10 years? Well, firstly, I would argue, let me take it this way. Firstly, they're not going to just keep putting them on parts in the car. They will be eventually on the passenger car on the outside, and the race car is just mostly inside. Yes, they will be. Yes, they will be. And there's, you know, that's not testimony in the case. That is an evidence of prior use, though, on the car. The actual evidence of prior use is selling the car with the matrix name on it, and there's no... On the... In the... Okay. On various parts of the car. And it rolls back to the same question. I found no law that said it has to be on the outside of the car, and that's for first use. In the same Gofu case, they held that first use in commerce owns it, even over someone who later federally registers the name. Okay. Let's assume that you do have a right to the mark by first use in commerce, but still, would you have to show a likelihood of confusion under the multi-factor test, or the summary judgment would be proper even if the judge was wrong on the use? So how do you address fact issues on the confusion issue? Okay. First of all, the law is you do not have to show actual confusion. Just likelihood of confusion. That's in the Gallo case. Secondly, the court held that the case law holds that the lack of actual evidence of confusion in a case where, in this case, the product was on the market for an extremely short period of time before the lawsuit was filed. The first Toyota claimed they sold their first car February 2002. The lawsuit was filed within 60 days, April of 2002. There wasn't even time to develop confusion evidence. And the court says whether you can show it or not show it in the circumstances of a short period of time, it's irrelevant if you can show a good trademark infringement case. That's what the law is on that issue. Irrelevant if you can show what? Try that again. I got to the conclusion, and what I understood wasn't what you wound up saying. Let me start this way. First of all, the law is you do not have to show actual confusion. Just likelihood of confusion. We follow that. Okay. In this case, and the case law holds that, and it's the Eclipse case, I believe. Excuse me. That Fashions, P-H-A-T, says that when a product, the Toyota Matrix, comes out on the market for a very short period of time, and which was February of 2002, the lawsuit filed April of 2002, that you don't have to show actual evidence of confusion doesn't help or hurt because it's too short a period of time to establish. So you are saying there's a likelihood of confusion between a Toyota car that is called a Matrix and a radiator that was inside a custom-made sports car? Let me change your focus, Your Honor, please. Well, I mean, I'm just trying to figure out what the apples and oranges are. Right, because I want to switch it back to apples and apples. It's not between a Toyota Matrix car and a Matrix radiator. It's between a Matrix car and a Toyota car. For example, in the case of the ---- Well, if you hadn't sold any cars that said Matrix, how could they be confused with the car? Because we sold cars on the open market with the name Matrix, but it wasn't on the outside of the car, but they were race cars, the passenger cars that are coming along for which they're billing the name. In the brief, it tells you that most manufacturers do not go into racing for the purpose of it's profitable. They go into racing to establish that to show the buying public that the passenger cars you're going to make with the same brand name arising out of the race car will be street good performing cars. It gives them a credibility. So a lot of times, new companies might go into race cars first, as Toyota does, to improve its street cars. So that's why they started with the race car, and they are billing the street cars. So to get to step B, you've got to first do step A. So to say that, how can you confuse a Matrix car with a radiator, is only looking at the very first step of the entire process. The process will end up resulting with the manufacture of passenger cars. When people bought the cars from Matrix that didn't have the name Matrix on the outside of them, did they have a brochure or anything else that said, what did they call the car? It was the record? Yeah, there's lots of information about, they have, what's the word for it? Promotional materials and stuff. Their next door neighbor said, what kind of car is that? Would they have said it's a Matrix car, or some wholly other thing? Your question begs, the way you ask the question begs the question. The question is, on a race car, your neighbor's not going to ask you what kind of car it is. When the passenger car comes out, that would be a legitimate question. But those passenger cars will say Matrix on them. But because he hasn't developed the passenger car yet, or it's on the market, doesn't mean that he loses his right to the trademark name. So there's nothing there that you can be confused with? That's Your question is, did the precursor, the race car, establish use for trademark purposes of a passenger car? Yes. What's the authority? I mean, it seems like an awfully long road. If you read the Sengofu case, S-E-N-G-O-F-U case, it talks about how you get the mark, and then one of the issues in the briefs, if you go back and look at it, is the issue of expansion. Expansion's a critical issue. Matrix Motors My question is, if you have a mark for racing products, engines, and you've established that in commerce, you have the right to expand the use of the mark in commerce? Yes, but I'll take it a step further. If you have racing cars that you want to expand into passenger cars, you absolutely have the right to expand into the other markets, because they're related. Because if you take a look at Toyota, we have both companies that use the name Matrix. They're both involved in racing. Both companies are involved in racing. Both involved in producing racing parts. Both produce cars, except that Matrix Corporation is going to produce their cars here in development. Both companies' products are similar in use and in function. They're both companies' products are closely related, if not more than in, which I want to bring to the Court's attention, in sleek craft. They compared high-speed water skiing race boats, and they said they were similarly confusing to related family recreational boats. They held that was confusingly similar. In the Fleischmann case, beer and whiskey, they held, because they used the same name, that beer and whiskey were confusingly similar, so that the public would believe that the name, black and white, they would think the same company was doing both. They could not determine who was the senior user and the junior user. In DreamWorks, even though they were here today, a very famous case said in the Ninth Circuit, they found a science fiction convention company as specifically, sufficiently related to DreamWorks, the movie corporation. So when they, in the United States Patent and Trademark Office, the USPTO, in April 26, 2002, rejected the first application for registration by Toyota for the name Matrix, because there was a company called Matrix Tires. And they said the Matrix Tires, which makes tires for cars and automobiles, trucks and automobiles, was sufficiently similar to create likelihood confusion. There's no difference between developing your first race car, then developing your passenger cars. They would be confusingly similar, because here in reverse confusion, which is what this is, typical trademark infringement, the junior comes in and tries to steal the name of the senior. Here it's called reverse confusion, where you have a small company fledging, growing, you have a giant company coming in with expensive economic wealth. And they come in and they do mass advertising, they do saturate the market with promotion, so that the consumer believes that the company that is really the junior user is the senior user. So people, your concern is that then, when you go to market a Matrix car, that your customers think it was manufactured by Toyota? Exactly. That's exactly, that's right on point. They're going to believe that everything that we produce as far as passenger cars after this will be the product of Toyota Matrix, or Toyota, not my client. And while we presented certain evidence, which was objected to as hearsay, we did get a letter from one company that said they could not use our products because they would think that, this was in the race car field, but they were, that if they used the product. That was an affidavit by whom? It was a letter by a man named Phil Stock. See, the rules under Grand Am rules in racing in the United States says that if you use an engine or a chassis of another manufacturer in the race car, you must put the name of the manufacturer on the outside of the car. And these companies, and this particular gentleman who does race, did not want to use Matrix Motors engine or transmission because they didn't want anybody to believe that they were in competition, because they're in competition with Toyota in racing. That's just one example. They received many calls. Can you read that in the record? Give me a slide so I can. Okay. 713 is the ER. What, I'm sorry? You want the excerpt site? Yeah. 713. Okay, thank you. Under the case of A.H. Sportswear, it says that in reverse confusion, that when this occurs, it hurts the credibility of the company. It hurts the product identity. It hurts the ability to continue to expand your products. Your story, we haven't expanded yet. I mean, why not go back to the same thing? Because who's going to get confused? You're not selling street cars. Matrix doesn't have a meaning for street cars with regard to your client. Doesn't have a what, Your Honor? Doesn't have a meaning for street cars for your client. It may be an aspiration of your client, but there's certainly been no use to date of the name in that field. First of all, it's more than an aspiration. They had plans drafted. They had engine done. They had cars, what's called, on a roller where they have the body on there. They didn't have use. They didn't have use, sir. Aspiration by itself is not use. So do I take it that it is, I want to say this properly, the law does not require that you can't use a name that you use first to create a trademark in a product because you want to use it for step two later. So therefore, you can't use step one. I can't say that somebody's confused with a product that you haven't yet manufactured. If someone makes trademark, if someone makes the Toyota Matrix, which is heavily promoted in the racing industry where there is confusion, where they took the Toyota Matrix and in 2001, introduced it at the New York Auto Show and called it the Matrix race car. It's not a race car, but they introduced it as a Matrix race car. They gave it to Urban Racer magazine to take around to racing events. What was the purpose? Because they want to capitalize on aftermarket high performance parts for the Toyota Matrix, which then increases the price of the car from approximately $20,000 to maybe $50,000. And one of the cars that's planned, and Toyota knows about this because they took the depositions of my client. They're creating a $75,000 roadster and there will be further confusion as time goes on. Okay, let me ask you this. The district court, let me ask you about fees. Can you talk for a moment about fees? You mean on the other appeal? Yeah. Sure. Because that's all we, this is it. This is it what? It's just one argument. It's just one argument. Oh. They're both before. Oh, I agree. This is it. All right. All right. Okay. I'll talk about it, but if you. I'll give you a minute on rebuttal, but just. I will. I just want to tell you one thing and then I'll go right to your answer to your question. There are at least 13 or 14 material issues of genuine fact which are raised in the brief that are critical. That's not just the one about confusion. There's reverse confusion. There's the issue of the housemark where the sleek crab case is very important. Yeah, we understand. We understand. The issue of attorney's fees is our belief that if we prevail in the reversal of the summary judgment that the case can't be exceptional because under the definition of exceptional, you have to find the case as groundless, unreasonable, vexatious, or pursued in bad faith. So that covers one major issue. We have other issues with the, and by the way, it's reviewed de novo under the earthquake case. I understand. What about the amount? Okay. The amount is, okay. In order for my client, in order for the court rather, to determine what's reasonable and what's not reasonable, it's supposed to articulate the reasons for whether the amount of, we're not arguing about the hourly rate, we're arguing about the hours spent. So if Toyota has a rich client, I mean if Toyota is a rich client who doesn't care much about their charge, that doesn't mean the amount they were charged was reasonable. There were issues raised by Mr. Friedman in open court about redundancy of numerous attorneys like we have today, two or three attorneys sitting here in the case, always in every hearing. There's no necessity for it. We have duplicate work by the attorneys which are documented in our brief. You have the, you have people working on doing the same things over and over again. They have discussions between each other and they keep charging. And one of the most glaring errors was they charged, the summary judgment was granted on July 1st, 2003. In July, for example, they charged $25,000 in costs to fly to Japan. Okay. I think we understand your position now. Thank you. We'll give you a minute on rebuttal if you feel that you want to respond to something. Thank you. May it please the court. John Hornick for the Toyota defendants and I have with me today Margaret Esplanade of my firm. Before I begin, your honors, I would like to make a correction. We realized last night that there's an error in the costs part of the bill of costs that was submitted to the district court. On the issue of travel, in the section, it's actually in SER 1408, there's a figure of $104,000 for travel. If you add up the figures that are actually in the column there, they don't add up to that. They add up to $78,000 and what we will do if the court affirms, we will ask the district court to amend the judgment accordingly because he considered an amount that was too large for the travel expenses. Also, just as long as I'm on the subject, I'll address July costs. Costs trail billable hours often. They depend on when we're billed by our vendors and they are often billed in a month later than the costs are actually incurred. To begin, the total amount of fees that were awarded by the district court was $1.123 million and the amount, the total amount that we requested was somewhat about $200,000 higher than that, I believe. We had also cut some money from the bill before we submitted the bill of costs. That's a lot for a frivolous lawsuit. Well, Your Honor, Judge Schroeder, this case, although it's frivolous from a substantive standpoint, from the amount of work that the plaintiff put us to in this case to try to defend ourselves, to develop basic discovery, required us to put in an inordinate amount of work to try to obtain the discovery that we should have been able to obtain easily. And in that regard, I would like to start with the issue of prior counsel, which relates to the plaintiff's request that Judge Morrow's order denying a motion for continuance, which would have given them 60 more days for discovery and then would have had a later trial. They're asking that that, they're saying that that was an abuse of discretion. And I would like to address that. It was entirely within Judge Morrow's discretion to deny that motion, and MMC was at least partially at fault. And charged, excuse me, and was charged with Mr. Friedman's lack of diligence. Now, Mr. Friedman was not necessarily incompetent and guilty of all of the things that he has been charged of in this case. It's entirely possible when you look at the facts that he was doing his best to hide the fact that MMC didn't have any evidence to support its case. He is still counsel of record from MMC. I feel we're getting kind of off track here. Let me just tell you my concern, okay? Yes. I don't see this as a frivolous lawsuit. So at least one judge thinks it's a serious suit. And if Matrix made pens, let's say, and they put in commerce the name Matrix with their pens, and they had plans to extend that to pencils. And Toyota was a big pencil manufacturer, and it came in and started calling its pencils Matrix pencils or had a line of them. I thought the law permitted a manufacturer who put a mark in commerce to extend it to other lines with some protection if they were similar or within a certain degree of similarity. So someone who made pancakes, let's say, might be able to put out some other product made of flour that wasn't pancakes and keep a mark that they established in pancakes protected. Now, maybe I'm wrong in that, and I'll study all the briefs. But if I'm right in that, then I don't see why it's so frivolous that Matrix, which uses the name with a racing car, can say, hey, we plan to use it for cars for street driving, and Toyota's screwing up our plans. So it's not like bad faith on Toyota's part. It's not frivolous on the plaintiff's part. You know, it's just an issue of what the trademark protects. Well, Judge Gould, you're correct that the trademark law does allow someone who's using a mark to expand into another area. But when doing a likelihood of confusion analysis, the issue of the likelihood of expansion is one factor that's considered in that analysis. And when considering that factor, there must be some concrete plans. It can't be pure speculation. There must be some concrete plans at the time that the junior user, in this case Toyota, enters the market. There is no evidence whatsoever, in this case, of any concrete plans. There are no photographs of this roller. There are no photographs of the chassis, no photographs of the body. There are no evidence of plans, drawings, blueprints. There's nothing whatsoever in the record to show that this car is in production. Excuse me. The official airline guide's case from the Ninth Circuit says that there must be a strong likelihood of expansion. And we would submit that there is no evidence of a strong likelihood of expansion. In fact, this car doesn't even exist. MMC has admitted that it doesn't exist. Just to clarify this point, if when Matrix sold its cars with the word Matrix on the engine, some kind of racing car, if at that point they had prospectuses and detailed drawings and they bought, contracted to buy machinery to have a line to sell streetcars, then would you agree that they could protect the name Matrix for the streetcars? Well, Your Honor, what I'd have to say is that if there were concrete plans in effect, if there had been any evidence of real efforts to bring this car to market, then that would be a factor that would favor MMC in a likelihood of confusion analysis. One of the sleep craft factors. It's one of the eight factors. That's right. But as I was saying, MMC has admitted that this car does not exist. In the brief that was submitted in the appeal, they said it exists. It was shown at the January 2004 auto show. They said that it was substantially complete by the end of 2003. But in a later brief in the same appeal, they said that that wasn't true. And in fact, that brief was filed while the Los Angeles Auto Show was going on. In a later brief, they recanted that position. So in other words, when the January 5th brief was filed stating that the car would be finished by the end of 2003 and would be shown at the Los Angeles Auto Show, which was going on at exactly the same time, first few days of January, that brief, that statement was false when written, which means either that MMC's counsel didn't confirm its facts with the client or that the client allowed the false facts to be used in the brief. In addition to that, even if this car ever comes out onto the market, MMC admitted that it does not plan to sell that car to the same people who buy the Toyota Matrix. That's at ER 308. In addition, they admitted that if such cars existed, the passenger car would not be confused with a Toyota Matrix car. That's at ER 304 and 308 and 309. Now, as I was saying, this is only one of the likelihood of confusion factors, and there are others. But before I discuss the others, I'd like to address this issue of use, which the court started with. As counsel admitted, MMC has admitted that they don't use the Mark Matrix on the cars themselves. They use it, they say, on parts. But they've also argued that only cars are relevant. They argued for dismissing all of our evidence of third-party uses in the automotive-slash-racing field. They said all that's relevant is the use on cars. So if they're excluding the use on cars for their purposes, they must also exclude it for all other purposes. Therefore, the issue of whether they use the Mark on parts or not is immaterial to this whole motion. What does the record say with respect to the use of the word matrix, which became a kind of a hot word recently in the automotive field? The record shows that. Are you asking about the use on the party's cars or third-party? No, I'm talking about I thought there was some evidence in the record that Matrix was used on other kinds of parts and tires and all this. Yes. Yes, that's right. There is evidence that there are at least 20 other uses of matrix in the automotive-slash-racing field. At least six of those are in the racing area. And incidentally, I believe it's five of these uses are in California. So when Planktiford argues that its California registration has any value, its strength, the strength of that registration, the strength of the Mark, which is matrix and design, must be judged in light of those other uses that are out there, five or six of which are in California. Now, on the subject of the likelihood of confusion factors, MMC makes the argument that the U.S. Patent and Trademark Office rejected the trademark application that was filed by our client for the word Toyota because of an application for tires. Well, that rejection has been withdrawn by the Trademark Office. That application filed by our client will issue once this matter is resolved. The only thing holding it up is an opposition filed by the plaintiff. It's suspended pending the outcome of this action. But importantly, again, MMC wants to argue that parts are important for purposes of this likelihood of confusion analysis. They say that it's relevant that the U.S. Patent and Trademark Office rejected the application for the car, Toyota's car, in view of tires. But at the same time, they want to reject all of our third party uses of anything except cars. So you see, they're being inconsistent in the argument that they're making. On the other likelihood of confusion factors, strength is one of the most important factors. And the issue is not, as it's been put in MMC's brief, between whether the mark matrix is arbitrary or whether it is descriptive, but it's whether it is a strong trademark. And as I just described to the court, this mark is weak in the automotive field. It's being used by at least 20 other companies in connection with the automotive field or with racing. Another important factor is the proximity or relatedness of the goods. And MMC ignores the factors that are set forth in the sleek craft case, the Ninth Circuit case that sets forth these eight factors. That case specifically breaks proximity or relatedness down into three sub factors. And they are evidence that the cars were sold or promoted together. Well, here, MMC has admitted that they don't advertise their product. That's at ER 295. Also, their cars are made by special order. Whereas Toyota's cars are sold through dealers. So they are not sold or promoted together. And all of this evidence is undisputed. The second sub factor of proximity is the different classes of purchasers. And here, MMC's admitted there are different classes of purchasers for Toyota's passenger car on the one hand and Matrix race car on the other hand. That's at ER 308, 309 and 204. You sort of usurp the field. I mean, I mean, Roger Penske, he's not likely to come out with a car called Camry, even though his Camry wouldn't be bought by the same people that buy Toyota's Camry because the field's kind of taken up. So and you've already heard that there is at least some evidence that suggests that there's reluctance to use the word Matrix as the source of engine transmission, whatever it was, on a race car. Because people are going to think, aha, that's a Toyota out there. And the owner in that case wasn't interested in having a Toyota type label on the on the vehicle. So, yeah, there may be different fields, but there's a sufficient overlap to at least understand the source of concern. Well, Judge Clifton, first to address the third party, that was Mr. Stott's letter. First of all, he's a potential British customer. So we're not talking about potential confusion that he saw in the United States. And that's all that's relevant here. Secondly, with respect to Camry, court takes judicial notice of Camry. Well, I would submit that although the court may be familiar with the Camry name, I would submit that Matrix is not nearly as popular. And in this record, there is no evidence that Toyota has taken over the name Matrix. There is no record that they've taken over the field of automotive products with the name Matrix. In fact, the evidence in this record is exactly the opposite, that there are 20 other uses out there. The third subfactor that was made by the Sleekcraft case for proximity is that there's no evidence of similarity in use or function. Well, on the one hand here, we have a passenger car that costs roughly $20,000. On the other hand, we have a racing car, which is only bought by professional racers and race teams and costs $350,000 to $450,000. This is all on the record. So it's undisputed that they have no similarity in use or function. With respect to the marks themselves, they are not identical marks. The plaintiff's president admitted that Matrix is always used with the company logo that is part of their trademark registration. And it's undisputed that Toyota always uses Matrix with the mark Toyota. So here, the marks are not identical. With respect to the issue of intent, another Sleekcraft factor, they argue that they sent the cease and desist letter and we didn't cease and desist. Well, under the Virgin Entertainment case of the Central District of California, no inference can be drawn from the rejection of a cease and desist letter. There could be good reasons why. And in this case, the record shows that Toyota asked for evidence after getting that cease and desist letter of the plaintiff's use and the plaintiff refused to provide any evidence of use or how they used it. In fact, to this day, Your Honor, we don't know what these race cars look like. I've never seen one. There are no photographs of them. There are no invoices that they've been sold. All we have is uncorroborated testimony of the CEO of the company, who, by the way, is not even an officer of the company. Also, on the issue of intent, there's uncontroverted evidence that Toyota did a search in July of 2000 that was before Matrix's registration issued, issued according to the record in December of 2000. It's uncontroverted that that search did not reveal their existence, so couldn't have adopted the mark with knowledge of them. And therefore, there couldn't be any intent on the issue of the. But but I will say that maybe you really. Is there anything that you are saying now that's not in the district court? Is there anything that's not in the district? I know all of these factors were addressed by the district court. Yes, that's right. On the issue of actual confusion, just to touch on that briefly, MMC admitted that no one has believed that MMC race cars were made by Toyota or vice versa. That's ER 309. They have no corroborative evidence for the alleged instances of confusion that they've presented to the court. No records were kept, although the CEO testified that he instructed employees to start keeping those records as of February of 2003. And as of this issue of whether there's any actual confusion, well, under the this court's Cohen case, it says that if there is actual confusion, although actual confusion is not required. If there's evidence of actual confusion, an inference can be drawn that there's a likelihood of confusion. Well, it's been one and a half years from the time Toyota started using the mark to the time that Judge Carney made his decision and no evidence of actual confusion in that time period. MMC presents some hearsay evidence, but it's not evidence of their customers. And in a reverse confusion analysis, which this is, we must look at their customers. The last factor that I'd like to address is the type of goods and degree of care. And here, this may be the most important factor. MMC doesn't allege that there are any disputes as to the degree of care that would be exercised by their customers. Their customers are professional racers buying a $350,000 to $450,000 race car. They're not going to buy it thinking that it came from Toyota. And that is the test in a reverse confusion analysis. Did MMC's customers believe they were dealing with Toyota? What if they, if they do come out with a street car, you know, a car for street use to be sold for $80,000, wouldn't the customers there be relevant, not the race car customers? First, Your Honor, I would argue that that factor expansion isn't applied to the other factors. It's only one factor in itself. But even if it's applied, then the test is going to be, is the customer who's buying a $70,000 or $80,000 car from Matrix Motor Company going to think that they are dealing with Toyota? That's the test in a reverse confusion analysis. Can I ask you a question? I'm getting back to the fees issue again. Are the fees awardable only on what, because if it's an exceptional case, is that? Yes, under Section 117 of the Trademark Act, they're awarded to the prevailing party in an exceptional case. And did, when did this case go from Judge Morrow to Judge Carney? I believe it was in May of 2000, may have been April of 2003. And we were in the midst of preparing for trial at that time and preparing a summary judgment motion. After the case was transferred to Judge Carney, we simply filed, he continued the trial date, and then we simply filed our summary judgment motion with him. What is it that makes this case exceptional in your view? Well, according to Judge Carney, and I think he's correct, what made this case exceptional was the fact that MMC grossly exaggerated its claims, could not make out any of the likelihood of confusion factors under the Sleekcraft case, and therefore lost on the summary judgment motion. And in addition to that, they engaged in an incredible road of abuse of the discovery process, made it unbelievably expensive for us to obtain basic discovery. Did most of that happen before Judge Morrow? Discovery was closed, yes, discovery was closed before Judge Morrow transferred the case. That's right. So Judge Carney was actually relying on, in part, on the discovery orders of both Judge Morrow and Magistrate Judge Lum, both of whom sanctioned Matrix for discovery abuses. Thank you, Your Honors. I'll make it really short, Your Honor, because I know it's been a long morning. First of all, Matrix Motors is coming out with a mid-engine, $75,000 roadster, mid-engine car, which will be in direct competition with the Toyota Matrix when they put the aftermarket parts on. And the issue of reverse confusion is this data. It's already had it in this record. I'm sorry, what? It's in the argument. It's laid out in the facts that Toyota is going, that Matrix Motors is in the process of making a $75,000 mid-engine car and a $150,000 super passenger car. It's in the record. In addition, when they come out with this car, the issue of reverse confusion, Your Honor, is very simple. It's, has the defendant, the powerful defendant, so saturated the market with advertisement that the consumer comes to believe that the product is that, not of the senior user, but of the junior who's coming to the market. That's the purpose of it. But I just want to clarify a couple of small points, and then I'll move really fast, Your Honor. One is, there is not one piece of evidence, not one, that even supports the name search that counsel just told you is supported uncontroverted. There was one statement in a declaration by an attorney, saying they did a record and they didn't find it. There was the, as a matter of fact, the... No, that's evidence. That's hearsay evidence, Your Honor. Not if he did it. That person didn't say they did it. They said there was a search made. There's a difference. Okay. You haven't used your time.  Thank you, Your Honor. I appreciate it. The case just argued and submitted for decision. That concludes the court's calendar for this morning, and the court stands adjourned. All rise. Court proceedings have been adjourned.
judges: Schroeder, Gould, Clifton